**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ASCENTIUM CAPITAL LLC,

     Plaintiff,

v.

PREMIERE COPIER, INC., a Colorado corporation,
MARK D. KLENIN, and TOD R. NORTH, individually
and in his capacity as Trustee of the Tod R. North Trust,

     Defendants.

## <u>COMPLAINT</u>

Plaintiff Ascentium Capital LLC ("<u>Ascentium</u>") hereby states its Complaint against Defendants Premiere Copier, Inc. ("<u>Premiere</u>"), Mark D. Klenin ("<u>Klenin</u>"), Tod R. North, individually ("<u>North</u>"),  and Tod R. North, as Trustee of the Tod R. North Trust (the "<u>Trust</u>") as follows:

### PRELIMINARY STATEMENT

Ascentium is the victim of a fraudulent scheme perpetrated by Premiere and its co-owners, Klenin and North (the three of which are collectively referred to as the "<u>Premiere Parties</u>"). Premiere purports to sell commercial copiers and related equipment to businesses in the United States, and Ascentium agreed to finance equipment purchases by Premiere customers. Over the course of approximately 18 months, Ascentium financed more than 100 transactions for Premiere's customers, totaling more than $5.464 million, taking a first-priority security interest in the financed equipment to secure repayment of the loans.

In early 2021, some of the loans in this portfolio came into default.  During the course of reviewing the defaulted loan accounts, Ascentium made a disturbing discovery—a pattern of cash

1

disbursements and other uses of the Ascentium funding proceeds by Premiere.  Specifically, the Premiere Parties facilitated cash kickbacks or rebates for its customers that were disguised as equipment financing transactions when presented to Ascentium.  In other words, Premiere submitted false and misleading information to Ascentium to induce approval and funding of equipment financings, received millions in funding proceeds from Ascentium, and disbursed monies to the customers without Ascentium's knowledge or consent; and, in some cases, Ascentium's funding proceeds were used to pay off the balances of customer loans and leases with other lenders.

The invoices that the Premiere Parties presented to Ascentium in furtherance of each of these purported equipment financings misrepresented the particulars of the transactions, and the consequences of these misrepresentations are far-reaching.  First, pursuant to its policies and procedures, Ascentium undertook a materially different underwriting process for these purported equipment financings as compared with its underwriting process for working capital loans.  Consequently, Ascentium was misled by the Premier Parties into approving purported equipment financings that would not have been approved as working capital loans, including the transactions that are now in default.  Second, Ascentium extended credit to these customers on terms that are unavailable to working capital loan borrowers.  Therefore, Ascentium has been deprived of the additional consideration (e.g., higher interest rate, shorter repayment term, "blanket" security interest in personal property to secure repayment) incorporated in its working capital loan products.  And third, Ascentium has been forced to repurchase some of the "equipment financings" that it sold into the secondary syndication markets by virtue of buyback provisions triggered due to the misrepresentations made by the Premier Parties.  Accordingly, Ascentium is bringing this

action to recover damages caused by the Premiere Parties including, without limitation, the losses incurred to date and expected future losses on this loan portfolio.

**PARTIES**

**A.      Ascentium Capital LLC (Plaintiff)**

1.      Ascentium is a Delaware limited liability company with its primary place of business in Texas.

2.      RF Ascentium, LLC, a Delaware limited liability company, is the sole member of Ascentium.

3.      Regions Bank, an Alabama state-chartered bank, is the sole member of RF Ascentium LLC. Regions Bank maintains its principal place of business in Birmingham, Alabama.

4.      Regions Bank is wholly owned by Regions Financial Corporation (NYSE: RF).

5.      For diversity purposes, Ascentium is a citizen of the State of Alabama, where Regions Bank is chartered and maintains its principal place of business.

**B.      Premiere Copier, Inc. (Defendant)**

6.      Premiere is a Colorado corporation with its principal place of business at 7442 S Tuscon Way #170, Centennial, Colorado 80112.  Premiere may be served with process through its registered agent, Tod North, at 7442 S Tuscon Way #170, Centennial, Colorado 80112 or wherever he may be located.

7.      For diversity purposes, Premiere is a citizen of the State of Colorado.

**C.      Mark D. Klenin (Co-Defendant)**

8.      Klenin is an individual residing at 9379 S Star Hill Circle, Lone Tree, Colorado 80124, where he may be served with process.

9. On information and belief, Klenin is a 50% shareholder of Premiere and has been a co-owner since its inception.

10. On information and belief, Klenin is an officer of Premiere and, at all times pertinent hereto, involved in the day-to-day management of Premiere.

11. For diversity purposes, Klenin is a citizen of the State of Colorado.

**D.    Tod R. North (Co-Defendant)**

12. North is an individual residing at 6576 S Sedalia Court, Aurora, Colorado 80016, where he may be served with process.

13. North is a Defendant in both his individual capacity and in his capacity as Trustee of the Trust.

14. On information and belief, North is the only Trustee of the Trust.  The Trust may be served through its trustee, North, at 6576 S Sedalia Court, Aurora, Colorado 80016, or wherever he may be located.

15. On information and belief, North is a 50% shareholder of Premiere and has been a co-owner since its inception.

16. On information and belief, North is an officer of Premiere and, at all times pertinent hereto, involved in the day-to-day management of Premiere.

17. For diversity purposes, North is a citizen of the State of Colorado—both in his individual capacity and in his capacity as Trustee of the Trust.

<strong>JURISDICTION AND VENUE</strong>

18. There is complete diversity of citizenship between Ascentium, on the one hand, and Defendants, on the other hand.  The sole member of Ascentium is RF Ascentium, LLC, whose sole member is Regions Bank, an Alabama state charted bank with its principal place of business

in Birmingham, Alabama.  Defendant Premiere is a corporation organized under the laws of the state of Colorado with its principal place of business in Centennial, Colorado, and Defendants Klenin and North are citizens of the state of Colorado.  Accordingly, complete diversity of citizenship exists pursuant to 28 U.S.C. §1332(a)(1).

19.     The amount in controversy in this action exceeds $75,000.00, exclusive of interest, fees, and costs.

20.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to Ascentium's claims have occurred in this judicial district.

<strong>BACKGROUND FACTS</strong>

**A.**     <u>**Ascentium's Business Model**</u>

22.     Ascentium provides commercial purpose equipment financing, equipment leasing, and working capital loans for businesses across the United States.

23.     With the typical equipment finance or lease transaction ("<u>Equipment Loan</u>"), Ascentium agrees to loan funds to a customer to pay for the customer's purchase of specific equipment from a vendor (like Premiere), and the transaction is documented by a written Equipment Finance Agreement or Lease Agreement between Ascentium and the customer, among other agreements, instruments, and documents executed by the customer in connection therewith (with all such agreements, instruments, and documents hereinafter referred to collectively as the "<u>Equipment Loan Agreement</u>").

24.     Under an Equipment Loan, Ascentium takes a purchase-money security interest in the equipment to secure repayment.  The equipment collateral operates as a source of recovery of the balance of the Equipment Loan Agreement for Ascentium upon a customer default.

25.     A valid and enforceable purchase-money security interest in equipment requires that funds advanced by Ascentium actually be used for the purchase of the equipment.  To that end, unlike a working capital loan, Ascentium does not disburse funds to the customer under the Equipment Loan Agreement.  Rather, funds are disbursed to the supplier of the equipment, after credit approval—and only upon receipt of an invoice identifying the equipment at issue and the purchase price.

26.     Ascentium also offers working capital loan products to small businesses in the United States (hereinafter a "Working Capital Loan"), where no equipment supplier or vendor is involved and net loan proceeds are disbursed directly to a customer for its business operations.

27.     However, the underwriting requirements and cost to the borrower for a Working Capital Loan are materially different than the underwriting requirements for an Equipment Loan.  Additional underwriting requirements for a Working Capital Loan, compared with a typical Equipment Loan, include among other things, (i) verification that the applicant has been in business for at least five years, and (ii) review of recent bank statements and banking activity.

28.     The credit terms for a Working Capital Loan also materially differ from the terms of an Equipment Loan.  For a Working Capital Loan, which carries more inherent risk for Ascentium than an Equipment Loan, among other differences, (i) loan repayment is capped at 24 months, (ii) a higher rate of interest is assessed, and (iii) loan repayment is secured by a "blanket" security interest in the borrower's assets, among other differences.  For an Equipment Loan, on the other hand, Ascentium (i) provides loan terms of up to 72 months, (ii) offers lower rates of

interest to borrowers, and (iii) requires that the customer pledge only the specific equipment being financed as collateral.

29.     Indeed, Ascentium generally charges an annual interest rate on a Working Capital Loan as much as three or four times Ascentium's rate for an Equipment Loan.

**B.**     **Origination of Parties' Business Relationship**

30.     Premiere advertises on its website (https://premierecopy.com/) that it is an authorized dealer of Copystar Kyocera Technology and Muratec copiers, printers, and digital solutions.

31.     According to Premiere, "[w]e sell & service one of the worlds (sic) largest selling copier products which offer a complete range of speeds for every application."

32.     Premiere advertises itself as offering customers a "custom digital package geared toward optimizing your specific wants and needs, while remaining reasonably below cost."

33.     As of December 2, 2021, Premiere's website (https://premierecopy.com/) lists no customer promotions, incentives, or specials that allude to any kind of cash rebate or "kickback" program associated with the financing or purchase of a copier from Premiere.  On information and belief, Premiere has never advertised such a program on its web site.

34.     As of December 2, 2021, Premiere's website (https://premierecopy.com/) does not identify Premiere as a loan broker or lender that secures working capital for customers.  On information and belief, Premiere has never advertised itself as a loan broker on its web site either.

35.     As of December 2, 2021, Premiere's website (https://premierecopy.com/) does not identify Premiere as a broker or lender that assists customers in need of refinancing an existing loan.  On information and belief, Premiere has never advertised this kind of service on its web site either.

36.     In or around November 2019, Premiere began discussions with Ascentium about establishing a vendor relationship.  These discussions centered around Ascentium providing Equipment Loans to customers that purchase commercial-grade copier machines and related equipment from Premiere.

37.     At all times pertinent hereto, Klenin and North were Ascentium's primary business contacts within Premiere.

38.     From inception of the relationship between Ascentium and Premiere, Klenin and North corresponded and engaged with Ascentium as officers, shareholders, and agents of Premiere.

39.     North completed a Vendor Finance Program Profile for Premiere ("Vendor Profile") in November 2019 and emailed the Vendor Profile to Ascentium for review and consideration.  A true copy of North's email and accompanying Vendor Profile is attached as **Exhibit 1**.

40.     Ascentium approved Premiere as a new vendor and, thereafter, Premiere began referring customers to Ascentium to obtain Equipment Loans.

41.     With each such referral, Premiere purported to be selling various Kyocera 3252CI, 3253CI, 3553CI, 3552CI, 4052CI, 4053CI, 5526, 6022I, 6630, and 6635 copiers and related equipment ("Copier Equipment") to one of its customers.

42.     From December 31, 2019 through August 17, 2021, Ascentium entered into 100+ Equipment Loans with the Premiere customers identified on **Exhibit 2** hereto (the "Vendor Portfolio"), and each such Equipment Loan relates to a customer's purported purchase of certain specific Copier Equipment from Premiere (a "Copier Sale").

43.     Each of the customers identified on the Vendor Portfolio is individually referred to as "Borrower" and collectively referred to as "Borrowers" herein below.

44.     For each Copier Sale, Premiere presented a Borrower to Ascentium to consider for an Equipment Loan.

45.     For each Equipment Loan, Ascentium was led to believe the Borrower was purchasing Copier Equipment from Premiere at the price set forth in the invoice that Premiere prepared for the Copier Sale.  True copies of the invoices that correspond with the Copier Sales (the "Invoices") are attached as **Exhibit 3** hereto and incorporated herein by reference.

46.     For each Equipment Loan, Ascentium was led to believe the Copier Sale was the product of a bona fide, arm's length purchase-and-sale transaction between Premiere and the Borrower at issue, whereby Premiere intended to sell and the Borrower intended to purchase Copier Equipment at the prices stated in the corresponding Invoice.

47.     For each Copier Sale, Ascentium undertook the underwriting process for an Equipment Loan rather than a Working Capital Loan, and Ascentium made its credit decision (i.e., Ascentium approved the credit request) on the basis of approving an Equipment Loan.

48.     Ascentium financed an aggregate amount of $5,427,580.77 and disbursed the aggregate amount of $5,356,752.02 to Premiere as funding for the purported Copier Sales listed in the Vendor Portfolio (the "Portfolio Funding").

49.     In or around August, 2021, Ascentium discovered Premiere had deliberately misled Ascentium regarding the particulars of the Copier Sales and had concealed an arrangement to secure money for Borrowers in order to refinance existing debts and/or provide new working capital to the Borrowers.

50.     Examples of these kickbacks from Premiere include the following:

(a)     On or about December 2, 2020, Ascentium advanced $94,300.00 under an Equipment Loan Agreement with a Borrower, BD Mortgage Group LLC, and disbursed those

proceeds to Premiere to pay the Invoice for a purported Copier Sale between Premiere and this Borrower.  Premiere then disbursed $60,000 of Ascentium's funding to this Borrower.

(b)     On or about February 26, 2021, Ascentium advanced $85,577.95 under an Equipment Loan Agreement with a Borrower, I-Deal Refuse Savings Inc., and disbursed those proceeds to Premiere to pay the Invoice for a purported Copier Sale between Premiere and this Borrower.  On March 1, 2021, Premiere disbursed $50,000 of Ascentium's funding to this Borrower.

(c)     On or about March 2, 2021, Ascentium advanced $59,858.90 under an Equipment Loan Agreement with a Borrower, Harris Law Firm PC, and disbursed those proceeds to Premiere to pay the Invoice for a purported Copier Sale between Premiere and this Borrower. On March 3, 2021 and March 9, 2021, Premiere made disbursements of $32,000 and $25,000 to this Borrower, respectively.

(d)     On or about March 26, 2021, Ascentium advanced $88,000.00 under an Equipment Loan Agreement with a Borrower, M. Elliot, Strong and Assoc., LLC, and disbursed those proceeds to Premiere to pay the Invoice for a purported Copier Sale between Premiere and this Borrower.  On March 29, 2021, Premiere disbursed $45,000 of Ascentium's funding to this Borrower.

(e)     On or about April 15, 2021, Ascentium advanced $44,749.95 under an Equipment Loan Agreement with a Borrower, Wide Horizon, Inc., and disbursed those proceeds to Premiere to pay the Invoice for a purported Copier Sale between Premiere and this Borrower. On April 16, 2021, Premiere disbursed $20,000 of Ascentium's funding to this Borrower.

(f)     On or about June 2, 2021, Ascentium advanced $20,017.78 under an Equipment Loan Agreement with a Borrower, Colorado Horseman's Council, and disbursed those

proceeds to Premiere to pay the Invoice for a purported Copier Sale between Premiere and this Borrower.  On June 3, 2021, Premiere disbursed $20,000 of Ascentium's funding to this Borrower.

51.     Ascentium terminated its vendor relationship with Premiere in August 2021, as Ascentium began to uncover this fraudulent scheme, and ceased approving credit applications or funding transactions for Premiere customers.

52.     Following Ascentium's termination of Premiere as a vendor, Ascentium confronted the Premiere Parties and demanded disclosure of Premiere's uses of the Portfolio Funding.  The Premiere Parties failed and refused to disclose the details of its kickbacks to Borrowers and other uses.

53.     On information and belief, each of the Borrowers identified in the Vendor Portfolio received a cash kickback or rebate in some form or fashion.

54.     As of March 2, 2022, 33 of the 106 Equipment Loan Agreements identified in the Vendor Portfolio are in default and in collection.

## COUNT 1

### FRAUD—FALSE REPRESENTATION

55.     Ascentium incorporates the preceding paragraphs of this complaint by reference as if restated in full.

56.     Premiere, acting by and through Klenin and North, made the following representations of material fact to Ascentium in furtherance of the Equipment Loans (the "Vendor Misrepresentations"):

(a)     That Premiere was participating in the transaction as an equipment distributor, as opposed to a loan broker;

(b)     That Borrowers were purchasing Copier Equipment from Premiere, as opposed to securing working capital;

(c)     That the Copier Sales that would be the subject of the Equipment Loans were the product of bona fide, arm's length purchase-and-sale transactions between Premiere and the Borrowers, whereby Premiere intended to sell and the Borrowers intended to purchase Copier Equipment at the prices stated in the corresponding Invoices;

(d)     That the Copier Equipment is new equipment, as opposed to used equipment;

(e)     That the Copier Equipment had not been pledged as collateral to any other lender;

(f)     That Premiere was selling the Copier Equipment to Borrowers at the prices listed in the Invoices, and the Invoices otherwise reflected a true and accurate description of the Copier Sales that Ascentium would be funding; and

(g)     That funding from Ascentium would only be used to pay for the items in the Invoices provided by Premiere.

57.     The Vendor Misrepresentations are and were materially false and misleading, and the Premiere Parties knew the Vendor Misrepresentations were materially false and misleading at the time they were made.

58.     The Premiere Parties made the Vendor Misrepresentations to induce Ascentium to approve the Borrowers for Equipment Loans (circumventing the underwriting requirements for Working Capital Loans), enter into Equipment Loan Agreements with Borrowers (under materially different terms than the terms offered by Ascentium for Working Capital Loans), and submit the Portfolio Funding to Premiere.

59.     The Premiere Parties intended for Ascentium to rely upon the Vendor Misrepresentations to approve the Borrowers for Equipment Loans, enter into Equipment Loan Agreements with Borrowers, and submit the Portfolio Funding to Premiere.

60.     By inducing Ascentium to approve these transactions with the Borrowers as Equipment Loans, the Premiere Parties were able to control the flow of funds because Ascentium disburses funding for Equipment Loans to the vendor, and Ascentium disburses funding for Working Capital Loans directly to the customer.  By controlling the flow of funds, Premiere retained a fee that would not ordinarily be paid to a vendor in a Working Capital Loan transaction.

61.     Ascentium reasonably and justifiably relied upon the Vendor Misrepresentations, individually and collectively, when it approved the Borrowers for Equipment Loans.

62.     Ascentium reasonably and justifiably relied upon the Vendor Misrepresentations, individually and collectively, when it entered into Equipment Loan Agreements with Borrowers.

63.     Ascentium reasonably and justifiably relied upon the Vendor Misrepresentations, individually and collectively, when it disbursed funds to Premiere on behalf of the Borrowers.

64.     Ascentium's reliance upon the Vendor Misrepresentations has caused and continues to cause Ascentium to incur losses and other damages as a result.

65.     Ascentium's losses and other damages caused by the fraudulent scheme described herein include, without limitation:

(a)     Losses attributable to approval and funding of these Equipment Loans in the amount of the Portfolio Funding, because none of the Borrowers qualified for Working Capital Loans on the same terms, plus statutory interest of eight percent (8%) per annum; or in the alternative, the loss of a higher rate of return for Working Capital Loans;

(b) Losses attributable to Borrower defaults on Equipment Loans that would not have been approved or funded but for Ascentium's reliance upon the Vendor Misrepresentations, equal to the difference between the Portfolio Funding allocable to each particular Borrower and the payments made by such Borrower to date, plus statutory interest of eight percent (8%) per annum;

(c) Losses attributable to the difference between the aggregate value of the Copier Equipment funded under the Equipment Loan Agreements and the stated values in the corresponding Invoices from Premiere, plus statutory interest of eight percent (8%) per annum;

(d) Losses attributable to Ascentium's inability to collect the outstanding balances of the Equipment Loan Agreements (including collection fees and costs, where applicable) from the property of Borrowers that would have been pledged as collateral for Working Capital Loans; and/or

(e) Out-of-pocket fees, costs, and expenses incurred by Ascentium to repurchase certain of these Equipment Loan Agreements.

66. The Premiere Parties engaged in a fraudulent scheme, and Ascentium has incurred substantial damages as a direct and proximate result thereof.

67. The Premiere Parties are jointly and severally liable to Ascentium for this fraud, in an amount to be proven at trial.

## COUNT 2

## FRAUD—CONCEALMENT

68. Ascentium incorporates paragraphs 1 through 54 of this complaint by reference as if restated in full.

69.     Premiere, acting by and through Klenin and North, concealed the following material facts from Ascentium in furtherance of the Equipment Loans (the "Concealed Facts"):

(a)     That Premiere was acting as an unlicensed loan broker for the Borrowers and assisting them with securing working capital;

(b)     That Borrowers were securing working capital through Premiere, with the Copier Equipment serving as a ruse to cause Ascentium to structure the transactions as Equipment Loans;

(c)     That the Copier Equipment listed in the Invoices was used equipment in some cases;

(e)     On information and belief, that the Copier Equipment listed in the Invoices in some cases had been previously pledged as collateral to any other lender;

(f)     That Premiere was kicking back or rebating cash to the Borrowers as part of the stated purchase price of the Copier Equipment in the Invoices; and

(g)     That funding from Ascentium would be disbursed to Borrowers and/or other lenders owed a payoff on preexisting indebtedness of such Borrowers.

70.     The Concealed Facts made the Invoices materially false and misleading, and the Premiere Parties knew the Concealed Facts made the Invoices materially false and misleading at the time the Invoices were submitted to Ascentium.

71.     The Premiere Parties intentionally withheld the Concealed Facts to induce Ascentium to approve the Borrowers for Equipment Loans (circumventing the more stringent underwriting requirements for Working Capital Loans), enter into Equipment Loan Agreements with Borrowers (under materially different terms than the terms offered by Ascentium for Working Capital Loans), and submit the Portfolio Funding to Premiere.

72.     The Premiere Parties intended for Ascentium to approve the Borrowers for Equipment Loans, enter into Equipment Loan Agreements with Borrowers, and submit the Portfolio Funding to Premiere, without any knowledge of the Concealed Facts.

73.     The Premiere Parties knew Ascentium would not approve the Borrowers for Equipment Loans, enter into Equipment Loan Agreements with Borrowers, and submit the Portfolio Funding to Premiere, if the Concealed Facts were disclosed to Ascentium in advance. Among other reasons, the Premiere Parties knew Ascentium would not disburse funding for Working Capital Loans through Premiere, as a vendor like Premiere has no legitimate role in a working capital transaction between Ascentium and a customer.

74.     Ascentium approved the Borrowers for Equipment Loans, relying on the assumption that the Concealed Facts did not exist.

75.     Ascentium entered into Equipment Loan Agreements with Borrowers, relying on the assumption that the Concealed Facts did not exist.

76.     Ascentium disbursed funds to Premiere on behalf of the Borrowers, relying on the assumption that the Concealed Facts did not exist.

77.     By relying upon the assumption that the Concealed Facts did not exist at the time, Ascentium incurred losses and other damages as a direct and proximate result.

78.     Ascentium's losses and other damages caused by the fraudulent scheme described herein include, without limitation:

(a)     Losses attributable to approval and funding of these Equipment Loans in the amount of the Portfolio Funding, because none of the Borrowers qualified for Working Capital Loans on the same terms, plus statutory interest of eight percent (8%) per annum; or in the alternative, the loss of a higher rate of return for Working Capital Loans;

      (b)    Losses attributable to Borrower defaults on Equipment Loans that would not have been approved or funded if Ascentium had been aware of the Concealed Facts, equal to the difference between the Portfolio Funding allocable to each particular Borrower and the payments made by such Borrower to date, plus statutory interest of eight percent (8%) per annum;

      (c)    Losses attributable to the difference between the aggregate value of the Copier Equipment funded under the Equipment Loan Agreements and the stated values in the corresponding Invoices from Premiere, plus statutory interest of eight percent (8%) per annum;

      (d)    Losses attributable to Ascentium's inability to collect the outstanding balances of the Equipment Loan Agreements (including collection fees and costs, where applicable) from the property of Borrowers that would have been pledged as collateral for Working Capital Loans; and/or

      (e)    Out-of-pocket fees, costs, and expenses incurred by Ascentium to repurchase certain of these Equipment Loan Agreements.

79.    The Premiere Parties engaged in a fraudulent scheme, and Ascentium has incurred substantial damages as a direct and proximate result thereof.

80.    The Premiere Parties are jointly and severally liable to Ascentium for this fraud, in an amount to be proven at trial.

## COUNT 3
## CIVIL THEFT UNDER C.R.S. § 18-4-401
## AGAINST THE PREMIERE PARTIES

81.    Ascentium incorporates the preceding paragraphs of this complaint by reference as if restated in full.

82.    The Portfolio Funding was the sole property of Ascentium before the transfer of same to Premiere.

83.     The Portfolio Funding is and was a thing "of value" within the meaning of Colorado's Civil Theft laws.

84.     The Premiere Parties, acting in concert with one another, used the Vendor Misrepresentations to fraudulently induce Ascentium to transfer the Portfolio Funding into a Premiere deposit account.

85.     The Premiere Parties, acting in concert with one another, withheld the Concealed Facts to fraudulently induce Ascentium to transfer the Portfolio Funding into a Premiere deposit account.

86.     The Premiere Parties, acting in concert with one another, knew that Ascentium would rely upon the Invoices as an accurate reflection of the Copier Sales before transferring the Portfolio Funding to Premiere.

87.     The Premiere Parties, acting in concert with one another, committed civil theft pursuant to C.R.S. § 18-4-401.

88.     When the Premiere Parties fraudulently obtained the Portfolio Funding by inducing Ascentium to transfer the same to a Premiere deposit account, the Premiere Parties obtained control of the Portfolio Funding without the requisite authorization of Ascentium.

89.     On each occasion that Ascentium tendered certain of the Portfolio Funding to Premiere, the Premiere Parties intended to permanently deprive Ascentium of its rightful use or benefit of such property.

90.     The Premiere Parties' fraudulent, malicious, willful, and wanton procurement and retention of the Portfolio Funding meets the statutory elements of criminal theft under C.R.S. § 18-4-401, including the requisite culpable mental state.

91.     Having established the elements of criminal theft under C.R.S. § 18-4-401, Ascentium is entitled to civil theft damages pursuant to C.R.S. § 18-4-405.

92.     Accordingly, the Premiere Parties are jointly and severally liable for three times the amount of actual damages Ascentium sustained, reasonable attorney's fees to be determined at trial, costs for bringing this action, and statutory interest under C.R.S. § 13-21-101.

**COUNT 4**
**NEGLIGENT MISREPRESENTATION CAUSING FINANCIAL LOSS**
**AGAINST THE PREMIERE PARTIES**

93.     Ascentium incorporates paragraphs 1 through 54 by reference as if restated in full.

94.     Premiere, acting by and through Klenin and North, made the following representations of material fact to Ascentium in furtherance of the Equipment Loans (the "Vendor Misrepresentations"):

(a)     That Premiere was acting as an equipment distributor, as opposed to an unlicensed loan broker;

(b)     That Borrowers were purchasing Copier Equipment from Premiere, as opposed to securing working capital financing;

(c)     That the Copier Sales that would be the subject of the Equipment Loans were the product of bona fide, arm's length purchase-and-sale transactions between Premiere and the Borrowers, whereby Premiere intended to sell and the Borrowers intended to purchase Copier Equipment at the prices stated in the corresponding Invoices;

(d)     That the Copier Equipment is new equipment, as opposed to used equipment;

(e)     That the Copier Equipment had not been pledged as collateral to any other lender;

(f)     That Premiere was selling the Copier Equipment to Borrowers at the prices listed in the Invoices, and the Invoices otherwise reflected a true and accurate description of the Copier Sales that Ascentium would be funding; and

(g)     That funding from Ascentium would only be used to pay for the items in the Invoices provided by Premiere.

95.     The Vendor Misrepresentations are and were materially false and misleading, and the Premiere Parties made the Vendor Misrepresentations without reasonable care about the truth thereof.

96.     The Premiere Parties made the Vendor Misrepresentations for the purpose of informing or misleading, or with the knowledge that such information would be used to inform or mislead, Ascentium in evaluating the credit applications of the Borrowers, deciding whether to enter into the related Equipment Loan Agreements, and determining when and whether to disburse funds under such Equipment Loan Agreements.

97.     Ascentium justifiably relied upon the Vendor Misrepresentations, individually and collectively, when it approved the Borrowers for Equipment Loans.

98.     Ascentium justifiably relied upon the Vendor Misrepresentations, individually and collectively, when it entered into Equipment Loan Agreements with Borrowers.

99.     Ascentium justifiably relied upon the Vendor Misrepresentations, individually and collectively, when it disbursed funds to Premiere on behalf of the Borrowers.

100.    Ascentium's reliance upon the Vendor Misrepresentations has caused and continues to cause Ascentium to incur losses and other damages as a result.

101.    Ascentium's losses and other damages caused by the negligent misrepresentations described herein include, without limitation:

(a)     Losses attributable to approval and funding of these Equipment Loans in the amount of the Portfolio Funding, because none of the Borrowers qualified for Working Capital Loans on the same terms; or in the alternative, the loss of a higher rate of return for Working Capital Loans;

(b)     Losses attributable to Borrower defaults on Equipment Loans that would not have been approved or funded but for Ascentium's reliance upon the Vendor Misrepresentations, equal to the difference between the Portfolio Funding and the payments made by such Borrower to date, plus statutory interest of eight percent (8%) per annum;

(c)     Losses attributable to Ascentium's inability to collect the outstanding balances of the Equipment Loan Agreements (including collection fees and costs, where applicable) from the property of Borrowers that would have been pledged as collateral for Working Capital Loans; and/or

(d)     Out-of-pocket fees, costs, and expenses incurred by Ascentium to repurchase certain of these Equipment Loan Agreements.

102.    The Premiere Parties are jointly and severally liable to Ascentium for negligent misrepresentation, in an amount to be proven at trial.

**COUNT 5**
**COMMON LAW CIVIL CONSPIRACY**
**AGAINST THE PREMIERE PARTIES**

103.    Ascentium incorporates the preceding paragraphs of this complaint by reference as if restated in full.

104.    The Premiere Parties, namely Premiere, Klenin, North, and others known and unknown, agreed by words or conduct, to accomplish an unlawful goal or to accomplish a goal through unlawful means as set forth herein.

105.    The Premiere Parties each performed acts in furtherance of the conspiracy to commit fraud, civil theft, and negligent misrepresentation to unlawfully obtain the Portfolio Funding from Ascentium.

106.    The Premiere Parties conspired to defraud Ascentium through unlawful means of falsifying the Invoices provided to Ascentium to secure the Portfolio Funding from Ascentium through fraud and negligent misrepresentation.

107.    The Premiere Parties promoted these transactions to the Borrowers as a means to quick and easy cash or refinancing for Borrowers.

108.    Unbeknownst to Ascentium, the Premiere Parties used their scheme as a means to increase their revenues and enhance their profits, as compared with the expected profits from an industry-standard sale of Copier Equipment.

109.    The Premiere Parties each acted with knowledge of the unlawful nature of the conduct in question.

110.    Ascentium suffered damages and losses that were directly and proximately caused by the Premiere Parties' unlawful acts in furtherance of the conspiracy to commit fraud, civil theft, and negligent misrepresentation. when it was unlawfully deprived of the Portfolio Funds.

111.    The Premiere Parties are jointly and severally liable to Ascentium for consciously conspiring and deliberately pursuing a common plan or design to commit fraud, civil theft, and negligent misrepresentation pursuant to C.R.S. § 13-21-111.5(4).

112.    Ascentium is entitled to damages for the full amount in the amount of the Portfolio Funding or such other amount to be proved at trial.

113.    Ascentium reserves its right to add a claim for exemplary damages if permitted to do so and appropriate under C.R.S. § 13-21-102.

**COUNT 6**
**UNJUST ENRICHMENT**
**<u>AGAINST THE PREMIERE PARTIES</u>**

114.     Ascentium incorporates paragraphs 1 through 79 by reference as if restated in full.

115.     The Premiere Parties are liable to Ascentium in quasi-contract, including unjust enrichment under Colorado law.

116.     In particular, as a result of fraudulently inducing Ascentium to transfer the Portfolio Funding to a Premiere deposit account, the Premiere Parties received a benefit at Ascentium's expense including, but not necessarily limited to, undisclosed kickbacks and fees taken from the funding that Ascentium remitted to Premiere.

117.     Under the circumstances, it would be unjust for the Premiere Parties to retain the benefit of the Portfolio Funding or the fees the Premiere Parties derived therefrom without commensurate compensation.

118.     In justice, fairness, and equity, Ascentium is entitled to recover all sums wrongfully obtained by the Premiere Parties.

119.     In addition to all other relief granted, the Court should impose a constructive trust upon the Premiere Parties and their assets as a remedy for unjust enrichment.

**COUNT 7**
**CIVIL LIABILITY UNDER THE COLORADO ORGANIZED CRIME CONTROL ACT**
**(COLO. STAT. ANN. §§ 18-17-101 ET SEQ.) AND THE FEDERAL RACKETEER**
**INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1967-1968)**
**<u>AGAINST THE PREMIERE PARTIES</u>**

120.     Ascentium incorporates paragraphs 1 through 80 by reference as if restated in full.

121.     The relationship between the three Premiere Parties constitutes an "enterprise" within the meaning of Colo. Stat. Ann. § 18-17-103(2) and 18 U.S.C. § 1961(4) (hereinafter, the "<u>Enterprise</u>").

122.    At all relevant times, the Premiere Parties are and were co-conspirators and participants in the Enterprise.

123.    The Premiere Parties operated the Enterprise by the actions set forth herein.

124.    The purpose of the Enterprise is and was to orchestrate a fraudulent lending scheme and to deceive Ascentium into financing approximately 106 loans to Borrowers under the guise that these transactions were bona fide Copier Sales.  In reality, the Premiere Parties presented Ascentium with Working Capital Loans disguised as Equipment Loans.

125.    The Enterprise is and was engaged in interstate commerce and in activities affecting interstate commerce.  The Enterprise is operated through individuals residing in Colorado, with Borrowers residing in states across the country.  Similarly, Ascentium is a Delaware limited liability company with its principal place of business in Texas.

126.    In operating the Enterprise, the Premiere Parties engaged in various forms of "racketeering activity" within the meaning of Colo. Stat. Ann. § 17-18-103(5) and 18 U.S.C. § 1961(1).

127.    As to Ascentium, the Enterprise has involved several acts of racketeering activity constituting a "pattern of racketeering activity" within the meaning of Colo. Stat. Ann. § 18-17-103(3) and 18 U.S.C. § 1961(5).

128.    The Premiere Parties' predicate acts comprising racketeering activity in the Enterprise include, but are not limited to, Mail Fraud, Wire Fraud, and Bank Fraud, as enumerated below.

A.    **Mail Fraud.**

129.    Mail Fraud constitutes a predicate act under Colo. Stat. Ann. § 18-17-103(5)(a) ("racketeering activity" also includes "[a]ny conduct defined as 'racketeering activity' under 18 U.S.C. § 1961(1)(A), (1)(B), (1)(C), and (1)(D)")

130.    Mail fraud also constates a predicate act under 18 U.S.C. § 1961(1). *See* 18 U.S.C. § 1341.

131.    18 U.S.C. § 1341 describes the offense of mail fraud as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

132.    Starting no later than December 2019, the Premiere Parties engage in an enterprise designed to defraud and obtain money from Ascentium through mail fraud.

133.    Specifically, the Premiere Parties knowingly held themselves out as authentic executives and employees of Premiere, intending to deceive Ascentium into believing that Premiere was acting as a bona fide distributor of equipment.

134.    The Premiere Parties used the mails to transmit bogus Invoices from Colorado (Premiere's place of business) to Texas (Ascentium's place of business) in furtherance of their Enterprise.

135.    The Premiere Parties knowingly participated and profited from the scheme to defraud Ascentium and wrongfully obtain possession of funds by acts of mail fraud.

**B.    Wire Fraud**.

136.    Wire Fraud constitutes a predicate act under Colo. Stat. Ann. § 18-17-103(5)(a) ("racketeering activity" also includes "[a]ny conduct defined as 'racketeering activity' under 18 U.S.C. § 1961(1)(A), (1)(B), (1)(C), and (1)(D)").

137.    The definition of "racketeering activity" in 18 U.S.C. § 1961(1) includes wire fraud. *See* 18 U.S.C. § 1343.

138.    18 U.S.C. § 1343 describes the offense of wire fraud as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

139.    Starting no later than December 2019, the Premiere Parties engage in an enterprise designed to defraud and obtain money from Ascentium through mail fraud.

140.    Specifically, the Premiere Parties knowingly held themselves out as authentic executives and employees of Premiere, intending to deceive Ascentium into believing that Premiere was acting as a bona fide distributor of equipment.

141.    The Premiere Parties used the wires to transmit bogus Invoices to Ascentium in furtherance of their Enterprise.

142.    The Premiere Parties knowingly participated and profited from the scheme to defraud Ascentium and wrongfully obtain possession of funds by acts of wire fraud.

### C.    Bank Fraud.

143.    Bank Fraud constitutes a predicate act under Colo. Stat. Ann. § 18-17-103(5)(a) ("racketeering activity" also includes "[a]ny conduct defined as 'racketeering activity' under 18 U.S.C. § 1961(1)(A), (1)(B), (1)(C), and (1)(D)").

144.    The definition of "racketeering activity" in 18 U.S.C. § 1961(1) includes financial institutions and/or bank fraud.  *See* 18 U.S.C. § 1344.

145.    18 U.S.C. § 1344 describes the offense of bank fraud as follows:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice – (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

146.    Ascentium is a "financial institution" within the meaning of 18 U.S.C. § 1344.

147.    Each of the Copier Sales listed in the Vendor Portfolio constitutes a fraudulent sales transaction by Premiere, acting in concert with Klenin and North.  And each such transaction constitutes a separate predicate act, meaning that Premiere Parties have engaged in more than two predicate acts towards Ascentium.

148.    Premiere Parties' multiple illegal acts have been taken as part of an ongoing pattern of racketeering activity designed to obtain money from Ascentium.

149.    As a direct and proximate result of this racketeering activity, Ascentium has been and continues to be injured and suffer actual damages in an amount to be demonstrated at trial.

150.    Pursuant to Colo. Stat. Ann. § 18-17-101 *et seq.* and 18 U.S.C. § 1961 *et seq*, Ascentium is entitled to recover three times actual damages sustained from Premiere Parties, plus punitive damages, attorneys' fees, and costs of investigation and litigation.

**COUNT 8**
**MONEY HAD AND RECEIVED**
**AGAINST THE PREMIERE PARTIES**

151.     Ascentium incorporates paragraphs 1 through 79 by reference as if restated in full.

152.     The Premiere Parties knew the Portfolio Funding from Ascentium was earmarked for the singular purpose of paying the Invoices on behalf of the Borrowers.

153.     The Premiere Parties knew, in turn, that Ascentium expected the Invoices to accurately reflect the cost of the Copier Equipment that Premiere was purportedly selling to the Borrowers.

154.     It turns out the cost of the Copier Equipment is a small fraction of the prices set forth in the Invoices.

155.     Under the circumstances, Ascentium is entitled to recover damages from the Premiere Parties for money had and received because the Premiere Parties, in equity and good conscience, are only entitled to retain the portion of the Portfolio Funding allocable to the cost of the Copier Equipment.

**COUNT 9**
**CONSTRUCTIVE TRUST**
**AGAINST THE PREMIERE PARTIES**

156.     Ascentium incorporates the preceding paragraphs of this complaint by reference as if restated in full.

157.     The Premiere Parties should not be allowed to enjoy the beneficial interest or ownership of the Portfolio Funding, which would violate the established principles of fairness and equity.

158.     A constructive trust should be imposed on the assets of the Premiere Parties traceable to the Portfolio Funding.

**COUNT 10**
**FRAUDULENT TRANSFERS UNDER THE COLORADO UNIFORM FRAUDULENT TRANSFERS ACT, C.R.S. §§ 38-8-101, *et seq.***
**AGAINST NORTH, INDIVIDUALLY AND AS TRUSTEE OF TOD R. NORTH TRUST**

159.     Ascentium incorporates the preceding paragraphs of this complaint by reference as if restated in full.

160.     Based on the conduct described herein, Ascentium as a "creditor" had and has "claims" against North, as a "debtor," as those terms are defined in the Colorado Uniform Fraudulent Transfer Act, C.R.S. § 38-8-101 *et seq.* ("CUFTA").

161.     Upon information and belief, North transferred certain parcels of real property described herein to himself in his capacity as the trustee of the Trust without receiving reasonably equivalent value in exchange, with the intent to hinder his future creditors in violation of CUFTA.

162.     North became the record owner of a parcel of land located at 6576 S Sedalia Court, Aurora, Arapahoe County, Colorado 80016 (the "Residence") pursuant to a Warranty Deed (the "Residence Vesting Deed") recorded on August 21, 2001 in Book B113, Page 9989 of the Arapahoe County Clerk and Recorder's Office. A true and accurate copy of the Residence Vesting Deed is attached as **Exhibit 4**.

163.     North became the record owner of second parcel of land, located at 14200 E Otero Avenue, #I-21, Englewood, Arapahoe County, Colorado 80016 (the "Warehouse"), pursuant to a Warranty Deed (the "Warehouse Vesting Deed") recorded on June 27, 2016 in Book D606, Page 7507 of the Arapahoe County Clerk and Recorder's Office. A true and accurate copy of the Warehouse Vesting Deed is attached as **Exhibit 5**.

164.     On or about December 13, 2017, North created the Trust and appointed himself as the Trustee.

165.     Pursuant to a Quitclaim Deed recorded in Book D800, Page 1368 of the Arapahoe County Clerk and Recorder's Office on January 4, 2018 (the "Residence Quitclaim Deed"), North transferred the Residence to himself, in his capacity as the Trustee of the Trust, in exchange for $0.  A true and accurate copy of the Residence Quitclaim Deed is attached as **Exhibit 6**.

166.     Pursuant to a Quitclaim Deed recorded in Book D800, Page 1367 of the Arapahoe County Clerk and Recorder's Office on January 4, 2018 (the "Warehouse Quitclaim Deed"), North transferred the Residence to himself, in his capacity as the Trustee of the Trust, in exchange for $0.  A true and accurate copy of the Warehouse Quitclaim Deed is attached as **Exhibit 7**.

167.     The Trust is an insider because, upon information and belief, North is the sole Trustee of the Trust.

168.     Upon information and belief, North did not receive a reasonably equivalent value in exchange for transferring the Residence and the Warehouse (collectively, the "Real Properties") to himself as the Trustee of the Trust.

169.     Based on the conduct described herein, North made these transfers while he was engaged or was about to engage in a business or a transaction for which his remaining assets were unreasonably small in relation to the business or transactions in which North engaged, or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due, in violation of CUFTA, C.R.S. § 38-8-105(1)(b).

170.     As a result of the foregoing, and upon information and belief, North transferred the Real Estate to the Trust to hinder, delay and/or defraud his current and future creditors, including Ascentium.

171.     Ascentium is entitled to an avoidance of the transfers of the Real Properties to the extent necessary to satisfy its claims; to an attachment or other provisional remedy against the Real

Properties; an injunction against further disposition of the Real Properties; a judgment against North and the Trust as provided by CUFTA; and/or to such other remedies as may be available under CUFTA, C.R.S. §§ 38-8-101 *et seq.*, including but not limited to C.R.S. §§ 38-8-108 and -109.

## PRAYER FOR RELIEF

WHEREFORE, Ascentium prays for a judgment against Defendants, jointly and severally as the facts may appear, and as set forth above, as follows:

A.    Under Count 1 (Fraud—False Representation), for an award of compensatory money damages against the Premiere Parties in an amount to be proved at trial;

B.    Under Count 2 (Fraud—Concealment), for an award of compensatory money damages against the Premiere Parties in an amount to be proved at trial;

C.    Under Count 3 (Civil Theft), for an award of money damages against the Premiere Parties in an amount three times the amount of Ascentium's actual damages to be proved at trial, reasonable attorney's fees, costs for bringing this action, and statutory interest under C.R.S. § 13-21-101 *et seq.;*

D.    Under Count 4 (Negligent Misrepresentation), for an award of compensatory money damages against the Premiere Parties in an amount to be proved at trial;

E.    Under Count 5 (Civil Conspiracy), for an award of compensatory money damages against the Premiere Parties in an amount to be proved at trial;

F.    Under Count 6 (Unjust Enrichment), for an award of compensatory money damages against the Premiere Parties in an amount to be proved at trial;

G.    Under Count 7 (Colorado RICO and Federal RICO), for an award of money damages against the Premiere Parties in an amount three times the amount of Ascentium's actual

damages to be proved at trial, reasonable attorney's fees, costs for bringing this action, and statutory interest under C.R.S. § 18-17-101 *et seq.* and 18 U.S.C. § 1961 *et seq.*;

H.    Under Count 8 (Money Had and Received), for an award of compensatory money damages against the Premiere Parties in an amount to be proved at trial;

I.    Under Count 9 (Constructive Trust), for an award of compensatory money damages against the Premiere Parties in an amount to be proved at trial;

J.    Under Count 10 (CUFTA), for an order setting aside and voiding North's fraudulent Real Estate transfers to the Trust, prohibiting the Trust from transferring and/or encumbering the Portfolio Funds and any other relief available to Ascentium under CUFTA including, without limitation, an award of Ascentium's attorneys' fees and costs;

K.    Under all Counts, for issuance of a pre-judgment writ of attachment of the Portfolio Funding in the Premiere deposit account;

L.    Under all Counts, for nominal damages, in the alternative to compensatory damages;

M.    Under all Counts, for post-judgment interest on the principal sums awarded at the legal rate permitted under applicable law; and

N.    Under all Counts, for such other and further legal and equitable relief that the Court deems just and appropriate.

Submitted by:

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.

*/s/ Kevin A. Stine*
Kevin A. Stine
Georgia Bar No. 682588

Kathleen G. Furr
Georgia Bar No. 589008
Monarch Plaza, Suite 1500
3414 Peachtree Road, N.E.
Atlanta, Georgia 30326
Tel.: (404) 577-6000
Fax: (404) 221-6501
Email: kstine@bakerdonelson.com
          kfurr@bakerdonelson.com


KUTAK ROCK LLP

*/s/ John H. Bernstein*
 John H. Bernstein, #17358
 Jeremy D. Peck, #36588
 1801 California Street, Suite 3000
 Denver, Colorado 80202
 Tel.: (303) 297-2400
 Fax: (303) 292-7799
 Email: john.bernstein@kutakrock.com
          jeremy.peck@kutakrock.com


*Counsel for Plaintiff*